UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>Kevin Porter, et al.</u>

      v.                                    Civil No. 20-cv-1210-JL
                                                Opinion No. 2025 DNH 128 P

<u>Willie Scurry, et al.</u>

## **MEMORANDUM ORDER**

This civil rights action concerns the conditions of confinement in the Hillsborough County Department of Correction's ("HCDOC") Valley Street Jail during a peak of the COVID-19 pandemic at the end of 2020. Plaintiffs Kevin Porter and Vincent Chaney, former pretrial detainees at the jail, contend that the actions of HCDOC and several of its employees violated their constitutional rights and assert claims under 42 U.S.C. § 1983. The court has federal question jurisdiction under 28 U.S.C. § 1331.

Porter and Chaney have sued HCDOC Superintendent Willie Scurry, Nurse Denise Hartley, and correctional officers Sergeant Brandon Diminico and Lieutenant Joshua Jordan. The plaintiffs originally filed *pro se*, but the court arranged *pro bono* counsel, whom the plaintiffs eventually retained.

All defendants have moved for summary judgment, and the plaintiffs object as to most defendants. The plaintiffs no longer pursue claims against defendant Deputy Chief of Security Brian Martineau, so the court grants summary judgment in his favor and

dismisses him from the case.[1]  The court held oral argument, after which the court twice requested additional briefing from the parties.[2]

As explained below, the court grants the defendants' motion for judgment on the pleadings and accordingly dismisses all individual defendants from the plaintiffs' "*Monell*" claim[3] (Count III).  The court grants summary judgment to correctional officers Diminico and Jordan but denies summary judgment to Nurse Hartley and Superintendent Scurry.  Finally, the court also denies summary judgment to HCDOC on the plaintiffs' *Monell* claim.

## I.    <u>Legal Standards</u>

The defendants filed a motion for judgment on the pleadings and motions for summary judgment.  The standard of review for a motion for judgment on the pleadings "is the same as that for a motion to dismiss under Rule 12(b)(6)." *Taylor v. Milford Reg'l Med. Ctr., Inc.*, 733 F. Supp. 3d 8, 13 (D. Mass. 2024) (quoting *Marrero-Gutierrez v. Molina*, 491 F.3d 1, 5 (1st Cir. 2007)).  The court accordingly "accept[s] as true all well-pleaded facts alleged in the complaint and draw[s] all reasonable inferences therefrom in the pleader's favor." *Douglas v. Hirshon*, 63 F.4th 49, 52 (1st Cir. 2023), *cert. denied*, 144 S. Ct. 621 (2024) (citations and quotations omitted).  But "[o]n a Rule 12(c) motion, unlike a Rule 12(b) motion, the [c]ourt considers the pleadings, including the answer."

---

[1] *See* Pls.' Objs. to Mot. for Summ. J. (doc. nos. 91, 92) at 2.
[2] *See* Procedural Order (doc. no. 98); Joint Stip. (doc. no. 101); Pls.' Suppl. Memo. (doc. no. 104); Defs.' Suppl. Memo. (doc. no. 105); Procedural Order (doc. no. 106); Pls.' Suppl. Memo (doc. no. 109); Defs.' Suppl. Memo (doc. no. 110).
[3] *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

*Ortolano v. City of Nashua*, 680 F. Supp. 3d 70, 75 (D.N.H. 2023) (McCafferty, C.J.)

(citing *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 54 (1st Cir. 2006)).  "Accordingly,

judgment on the pleadings is proper only if the uncontested and properly considered facts

conclusively establish the movant's entitlement to a favorable judgment."  *Id.* (cleaned

up).

As to summary judgment, a grant "is appropriate when there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  *Viscito*

*v. Nat'l Plan. Corp.*, 34 F.4th 78, 83 (1st Cir. 2022) (cleaned up).  "A genuine dispute is

one that would permit a rational factfinder to resolve the issue in favor of either party,

and a material fact is one that has the potential to affect the outcome of the suit under the

applicable law."  *Gattineri v. Wynn MA, LLC*, 63 F.4th 71, 84-85 (1st Cir. 2023) (citations

and quotations omitted).  In considering the motion, the "construe[s] the record in the

light most favorable to the non-moving party and resolve[s] all reasonable inferences in

that party's favor."  *Miller v. Sunapee Difference, LLC*, 918 F.3d 172, 176 (1st Cir. 2019)

(cleaned up).

## II.    **Background**

The plaintiffs' claims concern the conditions of their confinement at HCDOC

(commonly known as the "Valley Street Jail") during the COVID-19 pandemic.[4]

---

[4] While the plaintiffs filed a single complaint, the defendants filed separate summary judgment
motions against Porter and Chaney.  The motions for summary judgment refer to different factual
assertions by each plaintiff, but the motions' legal arguments are largely the same, and the
plaintiffs have submitted nearly identical objections to the motions.  Therefore, the court will
refer to the defendants' and plaintiffs' claims together unless differing factual assertions or legal
arguments necessitate different results.

Specifically, the plaintiffs claim that the defendants exhibited deliberate indifference to their rights to reasonable protection from communicable disease by implementing various policies and practices that subjected them to a substantial risk of contracting COVID-19. To evaluate this claim, the court must first review the applicable Center for Disease Control ("CDC") Guidance for correctional facilities during the relevant time period, the preventative measures adopted by HCDOC, the alleged deficiencies in HCDOC's COVID-19 response, and the grievances filed by the plaintiffs concerning the same.

### a. CDC Guidance

The parties agree that the CDC's "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" was effective during the pertinent period of plaintiffs' incarceration at HCDOC.[5]  The interim guidance, which was promulgated based on what was "known about the transmission and severity of [COVID-19] as of March 23, 2020," proposes a number of "specific preparation, prevention, and management measures" intended to help "reduce the risk of transmission and severe disease from COVID-19" in correctional and detention facilities.[6]  The guidelines include a caveat stating that they are not intended to "necessarily address every possible custodial setting" and "may need to be adapted based

---

[5] Joint Stip. (doc. no. 101) ¶ 1; *see generally* Ex. to Am. Compl. (doc. no. 63-1) ("Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities") ("CDC Guidance").
[6] CDC Guidance at 1-2.

on individual facilities' physical space, staffing, population, operations, and other resources and conditions."[7]

Relevant to the analysis here are the provisions about testing for COVID-19 and mask use. Although nothing in the guidance explicitly requires testing, several provisions in the guidelines contemplate onsite or offsite testing.[8] The guidance also provides that "[i]f a facility is not able to provide such evaluation and treatment, a plan should be in place to safely transfer the individual to another facility or local hospital."[9] As to staff responsibilities, the guidance provides that "[m]edical staff should evaluate symptomatic individuals to determine whether COVID-19 testing is indicated," and that "[if] testing is indicated," the facility should "contact the state, local, tribal, and/or territorial health department" and "[w]ork with public health or private labs as available to access testing supplies or services."[10] The CDC Guidance also includes directives for the management of inmates who are symptomatic but not tested for COVID-19 and thus appears to recognize that there may be circumstances in which testing for certain inmates proves infeasible.[11]

The CDC Guidance also provides guidelines around the use of face masks to prevent the spread of COVID-19. The guidance is unequivocal that "[i]f an individual

---

[7] *Id.* at 1.
[8] *Id.* at 7 ("Facilities without onsite healthcare capacity should make a plan for how they will ensure that suspected COVID-19 cases will be isolated, evaluated, tested (if indicated), and provided necessary medical care.").
[9] *Id.* at 24.
[10] *Id.* at 23.
[11] *See, e.g., id.* at 17, 20.

has symptoms of COVID-19 (fever, cough, shortness of breath)[, facilities should r]equire the individual to wear a face mask"[12] and that "[c]ontact [with an individual showing symptoms of a respiratory infection] should be minimized to the extent possible until the infected individual is wearing a face mask."[13]  The guidance also provides that face masks for all inmates "are not necessary" "[if] a facility chooses to routinely quarantine all new intakes (without symptoms or known exposure to a COVID-19 case) before integrating [those individuals] into the facility's general population."[14]

### b.  COVID-19 prevention at the Valley Street Jail

During the onset of the pandemic in 2020, HCDOC implemented several safeguards, including some specific precautions for correctional facilities recommended by the CDC.[15]  The plaintiffs dispute the implementation of several of these measures.

#### i.  Quarantine

HCDOC required all incoming inmates[16] to quarantine for 14 days upon arrival to the Valley Street Jail, during which time the inmates were "not permitted to comingle with other inmates within the facility."[17]  As part of this process, the defendants claim that all incoming and quarantined inmates were asked whether they had "fever, cough or

---

[12] *Id.* at 11; *see also id.* at 16 ("As soon as an individual develops symptoms of COVID-19, they should wear a face mask (if it does not restrict breathing)."); *id.* at 22 ("Incarcerated/detained individuals with COVID-19 symptoms should wear a face mask.").

[13] *Id.* at 24.

[14] *Id.* at 26.

[15] *See* Ex. to Defs.' Mot. for Summ. J. (doc. no. 86-2) ("Martineau Decl.") ¶ 4.

[16] The court uses the term "inmate" to refer to both pretrial detainees and convicted people serving their sentences at Valley Street Jail.

[17] Martineau Decl. ¶ 11.

shortness of breath" or if they had been in contact with someone who did.[18]  They also claim that all inmates received a mask to wear during booking and quarantine, and that staff monitored them for COVID-19 symptoms throughout the quarantine period.[19]  After 14 days of quarantine, inmates were deemed "medically cleared" and entered the general population.[20]  Chaney's grievance, however, discussed *infra* II.e, disputes that the facility followed its own 14-day quarantine policy and asserts that some inmates were permitted to enter the general population too early.

### ii.    Masking

In March 2020, all HCDOC staff members, including those who worked in housekeeping or in the kitchen, received and were required to wear personal protective equipment – namely, cloth and N-95 masks – while on duty.[21]  According to HCDOC, N-95 masks were to utilized when staff members were in the presence of COVID-positive inmates.[22]  As discussed *infra* II.e, Chaney submitted a grievance that challenges the extent to which the correctional officers complied with this policy.[23]  The plaintiffs also dispute the timing in which the jail handed out masks to inmates and staff.[24]

In October 2020, HCDOC's mask policy prohibited general population inmates from wearing their masks while outside of their cells on the housing unit.[25]  HCDOC

---

[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.* at ¶ 9.
[22] *Id.*
[23] *See* Ex. to Defs.' Mot. for. Summ. J. (doc. no. 86-5) ("Inmate Grievances") at 6.
[24] *See* Pls.' Supp. Memo (doc. no. 104) at 2 (relying on Porter's deposition testimony).
[25] Martineau Decl. ¶ 12.

reasoned that staff might struggle to identify inmates with facial masks and that the masks could be used to cover inmates' injuries or conceal contraband.[26]  HCDOC also relied on the fact that inmates had been "medically cleared" of COVID-19 before joining the general population through the initial quarantine process (discussed *supra*).[27]  In late December, after receiving the plaintiffs' written grievances complaining about the prohibition on masking for inmates outside of the housing unit, HCDOC modified its policy to mandate that inmates wear masks whenever outside of their cells.[28]

### iii.    Testing

HCDOC's policies and practices for administering COVID-19 tests to inmates changed after the HCDOC experienced its first outbreak of the virus in late December 2020 and January 2021.[29]  Prior to that point, HCDOC's policy was to test inmates only during the initial quarantine period and, once released into the general population, if they affirmatively complained of COVID-19 symptoms.[30]  HCDOC's policy did not mandate testing for any other inmates, including those who exhibited but did not affirmatively complain of COVID-19 symptoms.[31]  Though the defendants maintain that testing for inmates who requested it or exhibited symptoms consistent with COVID-19 exposure

---

[26] *Id.*

[27] *Id.*

[28] Martineau Decl. ¶ 12.

[29] *Id.* ¶¶ 8, 16.

[30] *See* Ex. A to Porter's Obj. to Mot. for Summ. J. (doc. no. 91-3) ("Scurry Dep.") at 20.

[31] Pls. Suppl. Memo. (doc. no. 104) at 6-8.

could be conducted off-site at a partnering hospital, Porter and Chaney assert that no such

testing routinely occurred prior to the outbreak. [32]

These assertions are consistent with the findings of a Hillsborough County

Superior Court judge, who issued the following order in considering the release of a high-

risk inmate at the Valley Street Jail to home confinement:

> "[T]he Court is deeply-troubled by the cavalier attitude that HCHOC has
> shown toward its inmates during the COVID-19 pandemic…[I]t is
> abundantly clear from the testimony of Superintendent Scurry and Health
> Administrator Hartley that HCHOC has acted in a manner that exhibits
> deliberate indifference to the health of its inmates by disregarding the
> substantial risk of COVID-19 to high-risk inmates like [the inmate at
> issue]… COVID-19 testing at HCHOC has been virtually non-existent.
> Although the pandemic has been ongoing for nearly nine months, as of the
> date of the hearing, only eleven inmates had ever been tested for the virus.
> Nine of these tested were administered pursuant to court orders…
> Superintendent Scurry acknowledged on multiple occasions during his
> testimony that he is unaware of the pertinent guidance from the CDC and
> NHDHHS… Suffice it to say that the deliberate indifference at this facility
> to the COVID-19 pandemic, particularly as it relates to high-risk inmates, is
> troubling at best."

*State v. James*, No. 2020-CR-00204, No. 2020-CR-00358 ("Order on Defendant's

Request for Bail"), at *2-3 (Dec. 31, 2020) (Temple, J.).

Additionally, HCDOC did not test correctional staff for COVID-19 before the

outbreak; rather, staff wore masks and were encouraged to stay home if they exhibited

---

[32] *See* Nurse Hartley's deposition testimony, *see* Ex. C to Porter's Obj. to Mot. for Summ. J.
(doc. no. 91-10) ("Hartley Dep.") at 9-14, 42); Ex. C to Defs.' Mot. for Summ. J. (doc. no. 86-7)
("Hartley Decl.") ¶ 6, Pls. Suppl. Memo. (doc. no. 104) at 6-8; Defs. (doc. no. 105) at 2. The
court takes the disputed fact of whether testing for symptomatic inmates who did not complain of
COVID-19 symptoms actually occurred prior to December 2020 in the light most favorable to
the plaintiffs when analyzing the summary judgment arguments.

COVID-19 symptoms.[33]  Both parties acknowledge that the "recommendation of the Department of Health and Human Services at times relevant to this litigation was to test symptomatic people for COVID-19."[34]

### iv.    Other precautions

The defendants identify a number of additional controls implemented at HCDOC to reduce COVID-19 exposure.  These measures include the installation of polycarbonate panels on cell windows, "which created a barrier between inmates residing in the cells and individuals, like staff, who were outside the cell."[35]  HCDOC also claims to have educated staff and inmates about preventing the spread of the virus, modified its cleaning procedures and increased cleaning frequency, and served food in single-serving containers and with single-service utensil dispensers when possible.[36]  HCDOC also modified its mail protocol in response to concerns arose about the virus' potential transmission via mail and temporarily suspended in-person visits.[37]

### c.  Defendants' alleged failures to adequately protect Plaintiffs from COVID-19

Porter arrived at HCDOC in June 2020 and quarantined immediately, although he exhibited no COVID-19 symptoms.[38]  After his quarantine ended and he was "medically

---

[33] Hartley Dep. at 72-74.

[34] Joint Stip. (doc. no. 101) ¶ 2.

[35] Martineau Decl. ¶ 10.

[36] *Id.* at ¶¶ 8, 13, 15; *see also* Ex. to Defs.' Mot. for Summ. J. (doc. no. 86-3 at 23).

[37] Martineau Decl.  ¶¶ 6, 10.

[38] Hartley Decl. ¶ 7.  The court notes that, in his deposition, Porter identified as transgender and stated a preference for she/her pronouns.  *See* Porter Dep. 14:20-23.  Porter's counsel's more recent filings, however, refer to Porter with he/him pronouns.  The court takes its cues from Porter's counsel.

cleared," Porter entered general population and was housed without a cellmate.[39]  Chaney arrived in November 2020 and also did not exhibit COVID-19 symptoms.  He completed the quarantine and subsequently entered general population, also housed in a cell without a cellmate.[40]

As noted above, a COVID-19 outbreak occurred at the Valley Street Jail in late December 2020.[41]  Porter and Chaney both tested positive for COVID-19 on January 3, 2021.[42]  While Chaney recalls experiencing symptoms of COVID, he has no lasting symptoms.[43]  Porter experienced some COVID-19 symptoms but did not submit a "sick slip" requesting hospital treatment.  Porter maintains that he continues to suffer from COVID-19 symptoms but has not received a formal diagnosis for "long COVID."[44]

Plaintiffs attribute the December 2020 outbreak – and thus their COVID-19 infections – to the defendants' implementation of various COVID-19 policies.[45]  As detailed above, HCDOC initially prohibited inmates from wearing in the common areas of their housing units and did not routinely test inmates exhibiting COVID-19 symptoms. Plaintiffs further assert that, prior to the outbreak, HCDOC failed to make liquid soap and hand sanitizer readily available to inmates, promote social distancing, post educational

---

[39] *Id.*; Martineau Decl. ¶ 3.
[40] Hartley Decl. ¶ 8; Martineau Decl. ¶ 3.
[41]  Scurry Decl. ¶ 4.
[42] Hartley Decl. ¶ 12.
[43] *Id.* at 128:6-8.
[44] Porter Dep. at 92.
[45] *See* Pl.'s Obj. Mot. Summ. J. (doc. no. 91) at 22.

signage about disease presentation, and medically isolate inmates symptomatic for COVID-19 (i.e., housed symptomatic inmates alongside asymptomatic inmates).[46]

In response to the outbreak, HCDOC collaborated with the Manchester Department of Public Health and the New Hampshire Department of Health and Human Services to complete facility-wide testing of inmates and staff.[47]  Though emails from that time show cooperation between the jail and the agencies, they also reflect that Nurse Hartley had to be repeatedly reminded to implement certain aspects of the CDC Guidance by the Manchester Health Department, including testing for symptomatic inmates.[48] Lindsay Pierce, an official at NH DHHS, observed in an email that the facility was "not well educated about COVID-19 outbreak response," "had not been report[ing] infected staff to NH DHHS," "had not implemented testing of ill residents," and "was unaware of the difference between isolation and quarantine."[49]  HCDOC ultimately made several changes to its COVID-19 policies consistent with these recommendations.[50]

### d.  Plaintiffs' Grievances

Both Porter and Chaney filed grievances with HCDOC relating to the facility's alleged failure to adequately protect them against the risk of COVID-19.  The grievance process for inmates at Valley Street Jail is set forth in the HCDOC Inmate Handbook, which provides:

---

[46] *See* Pls. Suppl. Memo. (doc. no. 104) at 2-5.

[47] *Id.* at ¶ 7.

[48] *See id*.

[49]  Ex. to Pl.'s Obj. Mot. Summ. J. (doc. no. 91-9) at 3.

[50] Scurry Decl. ¶ 7.

> All inmates have the right to file a written grievance concerning any matter relating to your confinement. You will not be punished or disciplined for filing a grievance unless it is deemed that you have shown a pattern of abuse of the grievance process by submitting frivolous or knowingly false documentation. A grievance may only be filed by the inmate who is directly affected by an alleged incident. No grievance(s) shall be accepted which is filed by a group or on behalf of a group of inmates. All decisions made by the county correctional facility's classification department or disciplinary hearings officer cannot be appealed through the grievance procedure.[51]

The handbook specifies that the complaining inmate must first "make a genuine attempt to seek an informal resolution of [the] problem with the staff member concerned."[52] Should the inmate wish to proceed with filing a grievance, the inmate must then "[f]ill out a request form requesting a grievance form stating [the] problem and suggested remedy" and submit the request form to their unit officer within 15 days of the date of the alleged incident.[53]  From there, an "assigned staff member" has fifteen days "from the receipt of grievance to investigate/review an alleged incident and provide a response []ial unless there are extenuating circumstances."[54]

### i.    Porter's grievances

The record contains two grievances from Porter.  In the first, filed on July 26, 2020, Porter complained that he watched a nurse enter his housing unit and pass out medication without sanitizing her hands.  He reported as follows:

> On 7-25-20 during 7:30 pm medication pass on the 2D Unit I observed nursing staff enter this housing unit and pass out medication without sanitizing her hands after entering a unit.  I then observed the same nurse

---

[51] Ex. to Defs.' Mot. for Summ. J. (doc. no. 86-4) ("Inmate Handbook") at 20.

[52] *Id.*

[53] *Id.*

[54] *Id.*

touch the wastebasket still with bare hands further contaminating her hands and continue to hand out medication, this nurse then touches her face mask and hair[,] still [with] no hand sanitizer[,] and continues to cross contaminate.  CDC guidance for health care providers per Covid-19 medication pass says upon entering a [] unit nurse must wash hands with soap and water for 20 seconds or use alcohol based hand sanitizer when dispensing medication, that sanitizer should be visible on the cart at all times.[55]

Nurse Hartley responded to this grievance by stating Porter, having not received any medication on the day in question, was not personally affected by the incident and thus could not grieve the issue.[56]  The superintendent stated that, regardless, Porter's claims were investigated and "deemed unfounded" based on findings that the nurse had not touched the wastebasket as alleged and had disinfected her hands prior to entering the unit.[57]

The second grievance concerns an incident that occurred on December 17, 2020, when Porter and Chaney were instructed by a corrections officer to remove their masks because they were outside of their cells on the housing unit.[58]  When Porter asked to speak with a supervisor, after Officers Diminico and Jordan, among others, responded to the situation.[59]  Officers Diminico and Jordan advised plaintiffs of the policy prohibiting

---

[55] Ex. to Defs. Mot. for Summ. J. (doc. no. 86-5) ("Grievances") at 3.

[56] *Id.*  Although the plaintiffs do not raise this argument, the court takes no position at this time regarding whether Hartley's response sensibly or correctly administered the grievance policy, as it seems like all inmates, including Porter, could be personally affected by policies regarding the spread of infectious disease, even those who did not personally receive medication during the alleged incident.

[57] Ex. to Defs. Mot. for Summ. J. (doc. no. 86-5) at 3.

[58] Exs. to Defs. Mot. for Summ. J. (doc. nos. 86-18; 86-19) (respectively, "Jordan Decl." and "Dominico Decl.").

[59] *Id.*

masks on the housing unit and reiterated the instruction they remove their face masks.[60]

The plaintiffs assert that they received this directive notwithstanding that they were in the

presence of other inmates on the housing unit who were coughing and sneezing and thus

obviously sick.[61]  Officer Jordan told Porter and Chaney that they could return to their

cells where they could wear their face masks if they felt more comfortable that way.[62]

Porter complained of the incident in a grievance filed the same day, writing:

> On 12-17-20 on Unit 1A I attempted to wear my mask to protect myself
> from any kind of exposure from Covid-19 and was told by Officer Franco,
> Lt. Jordan Sgt. Fournier and Sgt. Dominico that I could not wear my mask
> to protect myself from potential infection.  I then asked Lt. Jordan if he was
> really gonna disregard my health risk during the pandemic and force me to
> remove my mask and he responded yes I am.  No matter how many
> preventative measures this facility takes correctional staff cannot keep
> Covid-19 out of this facility.  As of 12-22-20 the superintendent said he is
> not testing anyone in this facility.  Not testing the population and refusing
> to allow detainees the option to wear a mask on their housing unit is a
> blatant disregard for the health and safety of the pretrial and sentenced
> inmates in the jail[']s custody as well as a threat to the surrounding
> communities and also constitutes the punishment of pretrial detainees
> before the adjudication of guilt.[63]

In response, Deputy Chief of Security Brian Martineau acknowledged that the

facility was "continu[ing] to deal with COVID-19 and the unique challenges [it] presents

to a correctional facility" and assessing and adjusting its procedures "when needed."[64]

Martineau then reported, as of December 23, 2020, general population and "classified"

---

[60] *Id.*  Prior to the December 17 incident, Chaney reports that he was operating under the assumption that inmates could wear masks anywhere but personally chose not wear his mask because he thought he "did not need to."  Ex. to Defs.' Mot. for Summ. J. (doc. no. 87-20) (Chaney Dep.) at 49:22-50:7.

[61] *See* Grievances at 5.

[62] Jordan Decl. ¶ 5.

[63] Grievances at 1.

[64] *Id.*

inmates would be required "to wear their facial masks whenever they exit their cells" and

had been "issued a second face mask."[65]  Superintendent Scurry concluded that no further

action was required.[66]

**e.  Chaney's grievances**

The record contains two grievances from Chaney.  First, Chaney grieved the

aforementioned December 17, 2020 incident:

> On 12/04/20 myself and one other detainee had been classified to unit 1-D,
> and were being moved along with three others who were classified to 1-E.
> We were all informed, as the masks were being handed out, by FTO Babson
> and C/O Goulding that 'the masks have to be worn whenever you break the
> threshold of your unit.'  It was also stated that 'you can wear them on the
> unit but it's not required.'  Fast forward to 12/17/20, around 8:30 PM or so,
> I put my mask on for my own personal safety and was asked by C/O Franco
> to take it off.  (It should be noted that a detainee's health, wellbeing, and
> safety outweigh the so called security risk, than wearing issued mask on the
> unit does.)  I informed him of what was told to me and the other detainees[]
> prior to moving to the unit and he hit the button on the wall for Central.
> Not long after Lt. Jordan, Sgt. Fournier, and Sgt. Dominico came to the unit
> like 3 [storm] troopers[] ready for a physical confrontation as well as C/O
> Franco, as he stood behind Detainee Porter in a ready stance.  I tried to
> explain that I didn't want to run the risk of contracting Covid-19 through
> any of the C/Os, a lot of who come on the units[] pulling their masks down
> exposing their mouth and nostrils, or other inmates and detainees for that
> matter.  Also that prior to me being reclassified to 1-D I'd just come off a
> two week 23 hr a day; sometimes 24hr, Covid-19 quarantine where I had to
> endure eating brown paper bag cold meals 3 times a day my entire time
> there, which Sgt. Dominico seemed to find humor in such a serious matter.
> Lt. Jordan tried downplaying it as being a "regular classification quarantine
> due to Covid-19," "because if we thought you were Covid-19 positive or
> showed signs we would test you here or take you out to be tested."  I
> informed him that was not true because prior to my detainment in this
> facility Hillsborough Superior North ordered me to report to this facility for
> a video arraignment, 11/13/20, when I was eventually met by Lt. Gonzales
> who stated, after finding out my reason for being here that day, "I don't

---

[65] *Id.*
[66] *Id.* at 5-7.

know why the fuck they sent you over here for an arraignment if they think you're Covid positive because we don't test here and we don't send you out for testing." Lt. Jordan tried telling me that Lt. Gonzales never said such a thing even though he had never been present for said conversation. It was at this time I asked, "so why had[n't] I been tested or sent out for testing." I guess that's when he ran out of, what I could only perceive to be, lies and excuses because as you are very well aware, upon a detainee's intake into this facility he is subsequently housed in the classification unit w[h]ere he must undergo a series of status changes, before he can be reclassified to a general populated housing unit, beginning with purple, red, yellow and then green. Again it should be noted that I was on yellow status barely a full week if that, before I was moved not to green status but straight to Unit 1.[67]

The correctional officers provided a response identical to the one they gave Porter, noting that the masking policy had been updated following this incident.[68]

Second, Chaney filed a grievance in which he complained about the defendants' COVID-19 response efforts in general terms:

Scurry, Martineau, Braga, Schweiger, and Hartley had an obligation to safeguard the health threats posed to not only myself, but to other detainees and inmates as well, yet instead they've caused physical injury from the wear and tear of constant worrying of getting sick, to actually contracting Covid-19 while in their care, and the feeling of being trapped and dying on a daily basis creating needless pain and suffering. Furthermore, they did this with a conscious reckless and outrageous indifference to the health[,] safety[,] and welfare of myself and others in this facility[,] causing irreparable harm to my physical and mental well being.
Braga, Schweiger, and Hartley as medical experts had a duty to advise Scurry and Martineau of the risk their actions created and also a duty to intervene[;] instead they failed to do so. This is why I must ask for monetary compensation. Please do not allow this grievance form to go unanswered the way grievance form #20-00228, issued 12/10/20. did.[69]

---

[67] *Id.* at 5.
[68] *Id.* at 5.
[69] *Id.* at 8.

In her written response to this grievance, Nurse Hartley reminded Chaney that he was not permitted to file a grievance on behalf of other inmates.[70]  Superintendent Scurry then concluded that no further action was required.[71]  In his deposition, Chaney conceded that he "messed up" this grievance because he knew that an inmate may not "submit a grievance on behalf of other inmates."[72]

## III.  Analysis

The plaintiffs assert claims against Hillborough County and the individual defendants under 42 U.S.C. § 1983, alleging that the conditions of their confinement at the Valley Street Jail during the pandemic—and the defendants' deliberate indifference to the risks associated with those conditions—violated their Fourteenth Amendment rights under the U.S. Constitution.[73]  Specifically, the plaintiffs contend that Hillsborough County and the individual defendants acted with deliberate indifference to their constitutional right to be protected from serious communicable disease by "blatantly disregarding the CDC Guidance," thus exposing Porter and Chaney to a "substantial risk of contracting COVID-19."[74]  The plaintiffs seek monetary damages for physical illness, pain and suffering, emotional distress, humiliation, inconvenience, and loss of enjoyment of life as well as punitive damages, attorney's fees, interest, and costs.[75]

---

[70] *Id.* at 8.
[71] *Id.*
[72] Chaney Dep. at 82-83.
[73] *See generally* Second Am. Compl. (doc. no. 63).
[74] *Id.* at ¶¶ 46, 48.
[75] *Id.* at ¶¶ 47-49, 52-54, 58-60.

The court first addresses the individual defendants' motion for judgment on the pleadings and dismisses the individual defendants from the plaintiffs' *Monell* claim. The court then analyzes the defendants' Prison Litigation Reform Act (PLRA) defense and finds that it limits the scope of the plaintiffs' claims considerably. The court then proceeds to the merits of plaintiffs' remaining section 1983 claims and the individual defendants' qualified immunity defenses, granting the defendants summary judgment as to the plaintiffs' claims against correctional officers Diminico and Jordan but not as to their claims against Superintendent Scurry and Nurse Hartley. Finally, the court considers the plaintiffs' *Monell* claim against Hillsborough County and concludes that it survives summary judgment.

### a. Motion for judgment on the pleadings

The plaintiffs have sued, under a *Monell* theory, all individual defendants in their official capacities, as well as Hillsborough County. The four individual defendants move for judgment on the pleadings, asking the court to dismiss them from the claims against them that are duplicative of claims against Hillsborough County.[76] "Official-capacity suits generally represent only another way of pleading an action against an *entity* of which an officer is an agent." *Signs for Jesus v. Town of Pembroke*, No. 15-CV-482-PB, 2016 WL 1171016, at *2 (D.N.H. Mar. 24, 2016) (Barbadoro, J.) (citing *Monell*, 436 U.S. at 690 n.55) (emphasis added).

---

[76] Defs.' Mot. J. on Pleadings (doc. no. 84).

The plaintiffs do not contest the individual defendants' dismissal from the *Monell* claim.[77]  The court accordingly dismisses Superintendent Scurry, Nurse Hartley, Jordan, and Diminico from Count III (the plaintiffs' *Monell* claim).  *See Signs for Jesus*, 2016 WL 1171016, at *2 (dismissing claims against officers in their official capacities when plaintiff also sued the town under a theory of municipal liability, holding that "[b]ecause of that redundancy, it is appropriate to dismiss the plaintiffs' claims against [an officer] in his official capacity.").  The claim survives as asserted against Hillsborough County.  Counts I and II remain as asserted against the individual defendants.

### b.  PLRA exhaustion

The Prison Litigation Reform Act provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997(a).  The PLRA is "an affirmative defense for which the defense must show both availability and non-exhaustion."  *Crocco v. Winkler*, 659 F. Supp. 3d 204, 210 (D.N.H. 2023) (McCafferty, C.J.).  "[U]nexhausted claims must be dismissed if a defendant raises the issue and proves that exhaustion requirements were not satisfied."  *McCauley v. Groblewski*, No. 18-2167, 2020 WL 6265069, at *3 (1st Cir. July 28, 2020); *see Woodford v. Ngo*, 548 U.S. 81, 85 (2006) ("Exhaustion is no longer left to the discretion of the district court, but is mandatory.").

---

[77] *See* Hr'g Tr. (doc. no. 107) at 4-5.

"[The correctional facility's] requirements, and not the PLRA, …define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007).  "Proper exhaustion of administrative remedies entails using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." *McCauley*, 2020 WL 6265069, at *3.  "[W]hat must be exhausted is the process, not the form of relief.  All 'available' remedies must be exhausted; those remedies need not meet federal standards; nor must they be 'plain, speedy, and effective.'" *Johnson v. Thyng*, 369 F. App'x 144, 146 (1st Cir. 2010) (citing *Booth v. Churner*, 532 U.S. 731, 739 (2001) and quoting *Porter v. Nussle*, 534 U.S. 516, 524 (2002)).  In other words, "[an inmate] must exhaust administrative remedies… even where the relief sought cannot be granted by the administrative process." *Thyng*, 369 F. App'x at 147 (citing *Booth*, 532 U.S. at 734).

"As in a notice pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief.  All the grievance need do is object intelligibly to some asserted shortcoming." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004) (quoting *Strong v. David,* 297 F.3d 646, 650 (7th Cir. 2002)).  "The operative principle regarding exhaustion is that when utilizing a prison grievance procedure, inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *O'Mara v. Dionne*, No. CIV 08-CV-51-SM, 2009 WL 3244742, at *4-*5 (D.N.H. Oct. 5, 2009) (McAuliffe, J.) (holding that plaintiff did not exhaust claim that he did not receive enough food because he "put jail officials on notice that he was displeased about the lack of variety in the sack

lunches…[but] gave no indication that he thought he was not getting enough to eat")
(citations and quotations omitted).

"A reasonable juror could find exhaustion, however, only with respect to those of
the plaintiff's claims in this action that he actually asserted in the grievance." *Shehan v.
Erfe*, No. 3:15-CV-1315 (MPS), 2017 WL 53691, at *8 (D. Conn. Jan. 4, 2017). Courts
have "conclude[ed] that the language included in particular grievances may be sufficient
to alert the prison to some, but not all, of a prisoner's claims (or some, but not all, of the
allegations upon which a particular claim is based)." *Riles v. Semple*, No. 3:17-CV-2178
(MPS), 2022 WL 124231, at *2 (D. Conn. Jan. 13, 2022); *see also Beltran v. O'Mara*,
405 F. Supp. 2d 140, 153 (D.N.H. 2005) (Diclerico, J.) ("[T]he fact that [plaintiff]
effectively grieved one of the allegedly unconstitutional conditions of his confinement
does not mean that he has administratively exhausted his claim that other conditions were
also unconstitutional, or, for that matter, that the conditions as a whole were."); *Scroggins
v. Warden, FCI Berlin*, No. 1:21-CV-870-JL, 2023 WL 2435635, at *3 (D.N.H. Feb. 10,
2023) (Johnstone, M.J.), *report and recommendation adopted sub nom. Scroggins v. FCI
Berlin, Warden*, No. 21-CV-870-JL, 2023 WL 2433312 (D.N.H. Mar. 9, 2023) ("[I]n his
administrative appeals…, [the plaintiff] never mentioned…the DHO's alleged bias …,
the DHO's alleged misrepresentation…, or the effect of the disciplinary decision….
Where the BOP was not afforded an opportunity to address those claims internally, [the
plaintiff] failed to exhaust his administrative remedies as to those claims.").

Here, the plaintiffs' claims against the defendants are based upon six policies and
customs allegedly practiced by the defendants during the plaintiffs' confinement: (1) the

prohibition on inmates wearing masks in certain common areas of the jail; (2) the failure to test inmates for COVID-19; (3) the housing of symptomatic inmates alongside asymptomatic inmates; (4) the failure to isolate symptomatic inmates; and (5) the failure to provide inmates with liquid soap and (6) hand sanitizer.[78]  The defendants assert that the plaintiffs failed to properly exhaust their administrative remedies with respect to all but one of these policies.[79]  Specifically, the defendants argue that, notwithstanding their knowledge and frequent use of the grievance procedure at HCDOC, the only grievances filed by the plaintiffs that cover any of the complained-of practices are those that Porter and Chaney submitted following the December 17, 2020 masking incident.[80]  The plaintiffs respond by arguing that the PLRA exhaustion requirement does not apply here because "[b]y the time the plaintiffs were able to grieve the defendants' failures to protect them adequately from COVID-19, the harm had already been done"—i.e., the outbreak had occurred and the plaintiffs had already contracted COVID-19—and thus that there were no administrative remedies "available" to the plaintiffs.  *See generally Crocco*, 659 F. Supp. 3d 204.  In the alternative, the plaintiffs submit that they satisfied the exhaustion requirement because their grievances sufficed to alert HCDOC that its practices and policies failed to adequately protect the plaintiffs from COVID-19.[81]

The plaintiffs' first argument misapprehends the law.  The "availability" of a remedy does not depend on the availability of a *particular* remedy.  Rather, the PLRA

---

[78] Pl's Obj. to Mot. for Summ. J. (doc. no. 91) at 1.
[79] Defs.' Mot. for Summ. J. (doc. no. 86-1) at 14-15.
[80] *Id.*
[81] Pls.' Surreply (doc. no. 96) at 5.

requires inmates "to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Ross v. Blake*, 578 U.S. 632, 642 (2016) (quoting *Booth*, 532 U.S. at 736).  The Supreme Court has enumerated three such situations where remedies are not "available":  when the process "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" when the grievance process is "so opaque that it becomes, practically speaking, incapable of use;" and when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643-44.  Porter and Chaney do not argue that any of those circumstances are present here.  The exhaustion requirement therefore applies to the plaintiffs' claims.

The court accordingly turns to the plaintiffs' contention that Porter and Chaney's grievances sufficed to put the defendants on notice of their conditions-of-confinement claims.  To assess this argument, the court considers each of policies that form the basis for the plaintiffs' claims and the extent to which the plaintiffs' grievances articulated an objection to that policy.  *See Beltran*, 405 F. Supp. 2d at 152 (noting that "an inmate's administrative filings must enable prison officials to resolve the alleged problem before it becomes the subject of litigation" in order to satisfy the administrative exhaustion requirement).

### i.    Housing unit masking prohibition

The defendants agree that the plaintiffs have exhausted their claim about the policy that inmates may not wear masks outside their cells on the housing units.  The

parties agree that this policy was in effect from November 2, 2020 to December 23, 2020.[82]

### ii.    Failure to test inmates

Because both Porter and Chaney complained in their grievances that the Valley Street Jail was not conducting any testing on inmates, the plaintiffs have properly exhausted their claims based on the defendants' failure to test inmates for COVID-19.[83] That the jail officials did not respond to this particular aspect of their grievance does not preclude a finding of proper exhaustion as the jail officials had the opportunity to engage with the merits of the issue without any procedural defects on the plaintiffs' part. *See Lineberry v. Fed. Bureau of Prisons*, 923 F. Supp. 2d 284, 293 (D.D.C. 2013) (cleaned up) ("If, however, [correctional] officials…ignore such a request…exhaustion may be excused.").

### iii.    Housing symptomatic inmates alongside asymptomatic inmates

Porter's grievances do not mention anything that the court could construe as a complaint about housing symptomatic inmates alongside asymptomatic inmates. Chaney's grievance covers a couple of interactions he had with correctional officers during the quarantine process, one of which appears to be a complaint about moving from

---

[82] Joint Stipulation (doc. no. 101) ¶ 3.
[83] *See supra* Grievances (Porter: "As of 12-22-20 the superintendent said he is not testing anyone in this facility.  Not testing the population … is a blatant disregard for the health and safety of the pretrial and sentenced inmates in the jail[']s custody."); (Chaney: "Lt. Gonzales…stated, after finding out my reason for being here that day, 'I don't know why the fuck they sent you over here for an arraignment if they think you're covid positive because we don't test here and we don't send you out for testing.'…I asked, 'so why had[n't] I been tested or sent out for testing.'").

the quarantine to the general population unit too quickly.[84]  This grievance, however, lacks sufficient specificity to allow Chaney to bring a claim for housing symptomatic inmates alongside asymptomatic inmates.  Chaney's grievance was a vague complaint about the quarantine process, rather than about housing, and the relief he requests from HCDOC does not concern housing at all (*see supra*).  *See Sosa v. Lantz*, No. 3:09CV869 JBA, 2013 WL 4441523, at *6 (D. Conn. Aug. 14, 2013) (finding claims unexhausted when "there is nothing that would have put Defendant on notice of the conditions of which Plaintiff now complains such that she could have taken appropriate action to remedy the situation").

### iv.    Failure to isolate symptomatic inmates

Again, Porter's grievances do not mention anything about the jail's alleged failure to isolate symptomatic inmates.  In Chaney's December grievance, he wrote that he wanted to wear a mask because "other inmates and detainees" "pull[] their masks down exposing their mouth and nostrils."[85]  This grievance put the defendants on notice that Chaney had concerns about contracting COVID-19 from correctional officers and people on his unit.  If the jail wanted to address this complaint, however, it would have tried to enforce mask compliance, not necessarily to isolate symptomatic inmates.  The grievance does not sufficiently exhaust the issue of isolating symptomatic inmates.

---

[84] *See* Ex. Defs.' Mem. Mot. Summ. J. (doc. no. 86-3) at 31-32 (detailing classification colors for quarantine that may correspond with Chaney's grievance).
[85] Grievances at 5-7.

### v.    Failure to provide liquid soap

Neither plaintiff grieved anything related to the provision of liquid hand soap. Therefore, they did not "fairly put defendants on notice of [their] claim that [they] had been injured as a result of a corrections officer's negligent (or, possibly, intentional) failure to protect him from a reasonably foreseeable threat of harm." *Lamarche v. Bell*, No. CIV. 04-CV-69-SM, 2008 WL 2568155, at *2 (D.N.H. June 25, 2008) (McAuliffe, J.).  *See Testman*, 380 F.3d at 697 ("In order to exhaust, therefore, inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures.").

### vi.    Failure to provide hand sanitizer

The defendants agree that the plaintiffs properly exhausted their claim as to the July 2020 complaint about a nurse's alleged failure to sanitize her hands.  *See Reyes v. Smith*, 810 F.3d 654, 658 (9th Cir. 2016) (citation omitted) ("[W]e hold that a prisoner exhausts such administrative remedies as are available, under the PLRA despite failing to comply with a procedural rule if prison officials ignore the procedural problem and render a decision on the merits of the grievance at each available step of the administrative process.").  Nowhere in either plaintiff's grievances, however, do they mention the jail's failure to provide inmates with hand sanitizer, and the grievance did not put the jail on notice about their complaints about hand sanitizer.  Therefore, neither Porter nor Chaney has exhausted this claim.

### vii.    COVID-19 policies generally

Finally, the court disagrees with plaintiffs' contention that they may bring an "umbrella" claim concerning the overall sufficiency of the jail's COVID-19 policies in general and procedures when the plaintiffs have not properly grieved all relevant conditions. *See Beltran*, 405 F. Supp. 2d at 153 ("[T]he fact that [the plaintiff] effectively grieved one of the allegedly unconstitutional conditions of his confinement does not mean that he has administratively exhausted his claim that other conditions were also unconstitutional, or, for that matter, that the conditions as a whole were.").

In summary, three of plaintiffs' claims survive application of the PLRA: (1) their Fourteenth Amendment conditions-of-confinement claim based on the masking policy against Superintendent Scurry, Correctional Officer Jordan, and Correctional Officer Diminico; (2) their Fourteenth Amendment conditions-of-confinement claim based on lack of testing against Nurse Hartley; and (3) their *Monell* claim against Hillsborough County based on both of the above: the masking policy and lack of testing.

### c.  Physical injury

The defendants allege that the plaintiffs' claims must fail because the plaintiffs have not provided evidence that demonstrates anything beyond a *de minimis* injury.   The PLRA states that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." 42 U.S.C. § 1997(e).  Some circuit courts of appeals have ruled that such an injury may not be *de minimis*.  *See Badger v. Correct Care Sols.,* No. 1:15-CV-00517-JAW, 2016 WL

1430013, at *4 (D. Me. Apr. 11, 2016) (Woodcock, J.) (collecting circuit authority on the requirement that the injury be "more than *de minimis*, but need not be significant").

The plaintiffs have not responded to this contention. Even so, the defendants' theory fails. As counsel for the defendants acknowledged at oral argument, the First Circuit has yet to rule on whether a plaintiff must show more than a *de minimis* physical injury to recover under the PLRA, and, as such, this court declines to find that anything more than a *de minimis* physical injury is required.[86] *See Sanders v. Arseneault*, No. 19-CV-12284-IT, 2021 WL 982452, at *5 n.2 (D. Mass. Mar. 16, 2021) (Talwani, J.) (stating, in case where plaintiff alleged non-*de minimis* injuries, "[t]he First Circuit has not determined whether the PLRA requires a showing of more than a *de minimis* injury"); *Disessa v. Massachusetts*, No. 1:18-CV-11024-IT, 2020 WL 1158254, at *5 (D. Mass. Mar. 10, 2020) (Talwani, J.) (same). The only cases cited requiring more than a *de minimis* showing of physical injury (from courts within the First Circuit or elsewhere) cite authority in other courts of appeals that are not binding here. *See Quinones–Pagan v. Administracion de Correccion*, No. 08–2199, 2009 WL 2058668 at *5 (D.P.R. July 10, 2009) (citing *Mitchell v. Horn*, 318 F.3d 523, 534 (3d Cir. 2003)) ("The physical injury need not be substantial, but must be more than de minimis"). Therefore, the defendants' argument fails.

---

[86] Hr'g Tr. (doc. no. 107) at 17-18.

### d. Fourteenth Amendment claims as to individual defendants

The court turns now to address the merits of the plaintiffs' surviving section 1983 claims against the individual defendants, which consist of their Fourteenth Amendment conditions-of-confinement claim based on the masking policy against Superintendent Scurry, Correctional Officer Jordan, and Correctional Officer Diminico and their Fourteenth Amendment conditions-of-confinement claim based on lack of testing against Nurse Hartley. Both claims rest on the theory that exposing inmates to a serious communicable disease like COVID-19 violates a pretrial detainee's right to humane conditions of confinement.

The individual defendants move for summary judgment on two grounds. First, they contend that their conduct does not meet the subjective standard for a Fourteenth Amendment claim. Second, they argue that they are shielded from liability by federal qualified immunity. For the following reasons, the court grants summary judgment to Officers Jordan and Diminico but denies the motion as it pertains the claims against Nurse Hartley and Superintendent Scurry.

### i. Legal standard

Section 1983 supplies a private right of action against any person who, under color of state law, deprives another of "any rights, privileges, or immunities secured by the Constitution and [federal] laws." 42 U.S.C. § 1983. "A pretrial detainee's claim that he has been subjected to unconstitutional conditions of confinement implicates Fourteenth Amendment liberty interests." *Surprenant v. Rivas*, 424 F.3d 5, 18 (1st Cir. 2005). "The parameters of such an interest are coextensive with those of the Eighth Amendment's

prohibition against cruel and unusual punishment," id., and include the right not to be confined under conditions "that [are] sure or very likely to cause serious illness and needless suffering," *Helling v. McKinney*, 509 U.S. 25, 33 (1993). The parties agree that the court should use the familiar Eighth Amendment standard for evaluating the plaintiffs' Fourteenth Amendment claims. [87] *See Burrell v. Hampshire Cnty.*, 307 F.3d 1, 7 (1st Cir. 2002) (using the Eighth Amendment standard for pretrial detainees' Fourteenth Amendment claims).

"In order to establish a constitutional violation, a plaintiff's claim must meet both objective and subjective criteria." *Surprenant,* 424 F.3d at 18 (citing *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). To satisfy the objective criteria, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. To satisfy the subjective criteria, an inmate must show "that prison officials possessed a sufficiently culpable state of mind, namely one of 'deliberate indifference' to an inmate's health or safety." *Burrell*, 307 F.3d at 8 (quoting *Farmer*, 511 U.S. at 835.

---

[87] Hr'g Tr. (doc. no. 107) at 19-20. In her proposed order on the defendants' motion to dismiss, Judge Johnstone wrote that, since the Supreme Court's ruling in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), it is "unclear whether a pretrial detainee asserting a Fourteenth Amendment conditions-of-confinement claim must show subjective deliberate indifference as required by the Eighth Amendment, or merely that the conduct 'purposely or knowingly used against him was objectively unreasonable.'" *Porter v. Scurry,* No. 20-CV-1210-JL, 2021 WL 2322915, at *3 (D.N.H. May 5, 2021) (Johnstone, M.J.) (citing *Kingsley,* 576 U.S. at 397), *report and recommendation adopted*, No. 20-CV-1210-JL, 2021 WL 2320138 (D.N.H. June 7, 2021). Judge Johnstone declined to decide the issue absent briefing by both parties. As the parties have not briefed this and have agreed to use the Eighth Amendment standard, the court does so as well.

"Deliberate indifference" is a "state of mind is more blameworthy than negligence." *Burrell*, 307 F.3d at 8. [88]  Rather, the standard is "directed at a form of scienter in which the official culpably ignores or turns away from what is otherwise apparent." *Leavitt v. Corr. Med. Servs., Inc.*, 645 F.3d 484, 497 (1st Cir. 2011) (quoting *Alsina–Ortiz v. Laboy*, 400 F.3d 77, 82 (1st Cir. 2005)).  Thus, to be "deliberate[ly] indifferent," a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Burrell*, 307 F.3d at 8 (quoting *Farmer*, 511 U.S. at 837).  Put differently, "to survive summary judgment, [the plaintiffs] must present enough evidence for a factfinder to conclude that… [the defendants] acted with 'wanton disregard' for [their] serious medical needs -- that is, [they] knew [the plaintiffs] faced a substantial risk of serious harm and yet failed to take reasonable measures to prevent it." *Lech v. von Goeler*, 92 F.4th 56, 75 (1st Cir. 2024) (citations omitted).

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence," *Farmer*, 511 U.S. at 842 (citations omitted), and may be proven "from the very fact that the risk was obvious," *id.*  Still, prison officials "who actually knew of a substantial risk to inmate health or safety may be found free from liability if

---

[88] The Court in *Helling* also noted that the subjective component of "deliberate indifference[] should be determined in light of the prison authorities' current attitudes and conduct, which may have changed considerably since the judgment of the [lower court]." *Helling*, 509 U.S. at 36. The defendants, however, have not made this argument, so the court cannot consider it.

they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

**Only subjective prong at issue.** At summary judgment, no defendant challenges that an outbreak of COVID-19 in a correctional facility presents a substantial risk of serious to the facility's inmates, so the court assumes that the plaintiffs have satisfied the objective prong of their claims.[89] The court accordingly limits its analysis to the subjective prong of the plaintiffs' claims, considering whether the plaintiff has adduced enough evidence from which a rational factfinder could find that any of the individual defendants acted with deliberate indifference towards the plaintiffs' risks of contracting COVID-19.

### ii.    Officers Diminico and Jordan

Porter and Chaney's only specific allegations about Officers Diminico and Jordan relate to the December 17, 2020 incident regarding mask use on the housing unit.[90] The plaintiffs argue that a jury could find that Diminico and Jordan were deliberately indifferent because, on a single occasion, in compliance with HCDOC policy, they "order[ed] the plaintiffs to remove their masks in a common area, where multiple inmates were coughing and manifesting symptoms of illness."[91] In response, Diminico and Jordan contend that there is no evidence that they saw any residents who had COVID-19

---

[89] *See* Hr'g Tr. (doc. no. 107) at 61-62.

[90] The plaintiffs do not argue that COs Diminico and Jordan participated in any of the other deliberately indifferent behavior alleged, such as the facility's testing policy or noncompliance with their own masking requirements.

[91] Pl.'s Obj. Mot. Summ. J. (doc. no. 91-1) at 16.

symptoms and that neither officer would have reason to believe that any of the inmates were positive for COVID-19 given the precautions HCDOC took to screen arriving inmates for COVID-19 before releasing them into the general population.[92]  They further note that they told the plaintiffs that they could return to their cells if they felt unsafe.[93]  The presence of others manifesting COVID-19 symptoms is a disputed fact in the case, so the court construes it in favor of plaintiffs and proceeds on the assumption that there were other people on the housing unit who were visibly sick.  It is undisputed, however, that Diminico and Jordan told the plaintiffs that they could return to their cells and that the jail had a policy that inmates on the housing unit could not wear their masks in common spaces.

Given the record evidence, the court finds that Diminico and Jordan "responded reasonably" to any risk that the plaintiffs faced, and thus that no rational trier of fact could find that either acted with deliberate indifference.  *See Burrell*, 307 F.3d at 8. Diminico and Jordan followed the applicable protocol when they instructed Porter and Chaney to remove their masks or return to their cells, and the plaintiffs have not offered any evidence that the two had the authority to change or disregard policy in the jail.  Even if Diminico and Jordan thought that other people on the floor may have contracted COVID-19 (or were otherwise sick), they responded reasonably to the risk to Porter and Chaney by suggesting that they return to their cells if they felt unsafe.  *See Hodges v. Meletis*, 109 F.4th 252, 260 (4th Cir. 2024) (citations and quotations omitted) (finding no

---

[92] Defs.' Reply at 5.
[93] Defs.' Mot. for Summ. J. (doc. no. 86) at 25.

Eighth Amendment violation "when an inmate *can* choose to avoid a particular condition or activity or has the means to secure his own necessities, [because] he necessarily has the power to exercise responsibility for his own welfare"); *Clark v. Chapman*, No. 21-1652, 2022 WL 19833097, at *4 (6th Cir. Nov. 22, 2022) (finding no Eighth Amendment violation where plaintiff "alleged, for example, that [the defendants] instructed him to return to his housing unit when he refused to work in the segregation unit, thus undercutting his assertion that he was compelled or pressured to work amongst COVID-positive prisoners"). Porter even admitted that, if he "had concerns about other individuals coughing and sneezing, [he could] have just remained in [his] cell."[94] The court agrees with the defendants and grants summary judgment in favor of Diminco and Jordan.[95]

### iii. Nurse Hartley

The presence of several disputed factual issues mandate a different conclusion with respect to Nurse Hartley. First, Hartley and the plaintiffs have offered conflicting testimony about the amount of testing at the facility between March and December 2020, as well as the facility's ability to either send individuals out for testing or conduct testing itself. Hartley contends that HCDOC did not "receiv[e] any inmate complaints or any medical request forms saying [that inmates were having] symptoms of Covid,"[96] and maintains that testing "was available for inmates if they exhibited symptoms that were

---

[94] Porter Dep. 49:22-50:5.
[95] Because the court finds that no reasonable jury could find the officers deliberately indifferent, it will not address their qualified immunity argument.
[96] Hartley Dep. 44:18-19.

consistent with COVID-19 exposure or requested testing" through the facility's

partnership with Elliot Hospital.[97]  The plaintiffs testified, however, that "there [were]

quite a few people that had symptoms, but they [weren't] diagnosed with COVID

because again they [were not] testing."[98]  Chaney also testified (and grieved) the fact that

a jail official told him that "we don't test here and we don't send you out for testing."[99]

In other words, the record contains conflicting evidence about the extent to which testing,

even if available, actually occurred in the months prior to the outbreak.  The record also

contains emails in which a public health official observes that HCDOC "had only

complete[d] some limited planning" for a COVID-19 outbreak and "had not been

reporting infected staff to NH DHHS, had not implemented testing of ill residents, was

unaware of the difference between isolation and quarantine, etc."[100]

  Overall, these facts establish a dispute about whether symptomatic people in the

facility existed, the officials' knowledge of these ill inmates, and the lack of testing.  *See*

*Hampton v. California*, 83 F.4th 754, 767 (9th Cir. 2023), *cert. denied sub nom. Diaz v.*

*Polanco*, 144 S. Ct. 2520, 219 L. Ed. 2d 1200 (2024) ("[A]n Eighth Amendment claimant

---

[97] Hartley Decl. ¶ 6.

[98] Chaney Dep. 28:8-12.

[99]  Grievances at 6; *see Chaney Dep.* 50-51 (Chaney stating that he noticed symptomatic inmates and staff periodically from his arrival until mid-December).

[100] *See* Ex. G. to Pl.'s Obj. Mot. Summ. J. (doc. no. 92-9) at 3 (email from Lindsay Pierce, chief of Infectious Disease Prevention at NH DHHS).  The defendants have raised potentially legitimate but unspecified hearsay concerns about the plaintiffs' evidence.  *See* Defs.' Reply at 2 n.3 ("Plaintiffs rely on emails or newspaper articles where third parties appear to question the HCDOC's adherence to the CDC guidance").  The court cannot address the admissibility of the evidence in the abstract without knowing the purpose for which the evidence would be admitted and the defendants' particular objection to the evidence.  Therefore, the court will address these insufficiently developed evidentiary and hearsay-related arguments through pretrial motions *in limine* or trial objections, if made.

need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.").  Hartley, as a medical professional tasked with overseeing the administration of medical care to inmates in a correctional facility,[101] should have (and very well may have) known that the potential contraction of COVID-19 presented a grave risk of harm to inmates and that conducting some amount of testing in the interim nine months could have helped to prevent the spread of COVID-19.  Indeed, the quarantine policy enforced by Hartley and her staff, under which arriving inmates were carefully monitored for and cleared of any COVID-19 symptoms prior to being released into the general population, reflects an implicit acknowledgement of the risks that a symptomatic inmate presents to other inmates living in close quarters and the necessity of taking reasonable steps to prevent such contact from occurring.  The same is true for Nurse Hartley's concession that testing was "available for inmates if they exhibited symptoms that were consistent with COVID-19 exposure."[102] Choosing to turn a blind eye to symptomatic inmates, despite knowledge of the transmissibility of COVID-19 and the availability of testing, could be found to constitute deliberate indifference. *See Savino v. Souza*, 459 F. Supp. 3d 317, 331 (D. Mass. 2020) (Young, J.) ("Keeping individuals confined closely together in the presence of a potentially lethal virus, while neither knowing who is carrying it nor taking effective measures to find out, likely displays deliberate indifference to a substantial risk of serious harm").

---

[101] Hartley Decl. ¶ 1.
[102] Hartley Decl. ¶ 6.

Nurse Hartley's contention that "[n]othing about [the plaintiffs'] purported symptoms gave rise to a need to elevate [them] to a higher level of care or otherwise afford [them] with further care than was provided to [them]"[103] misses the mark.   The plaintiffs challenge the actions that created an increased risk of exposure to COVID-19, not the medical care that they received.  For all the reasons identified above, there exists a triable question concerning the extent to which Hartley knew of this risk to plaintiffs yet failed to take reasonable measures to prevent it from occurring.  The court accordingly denies Hartley summary judgment on the plaintiffs' section 1983 claim arising out of the failure to test inmates for COVID-19.

### iv.  Superintendent Scurry

The court likewise denies summary judgment to Superintendent Scurry on the plaintiffs' section 1983 claim arising out of the alleged prohibition on inmates wearing masks in certain parts of the prison.[104]  Scurry contends that he should be entitled to summary judgment because the plaintiffs do not make any allegations about him on a personal level,[105] arguing that the implementation of the mask policy does not implicate his subjective mindset.  The plaintiffs disagree, arguing that Scurry's implementation of

---

[103] Defs.' Mot. for Summ. J. (doc. no. 86-1, doc. no. 87-1) at 24.

[104] At oral argument, counsel for plaintiffs acknowledged that the plaintiffs did not pursue claims against Scurry regarding lack of testing in the facility.  *See* Hr'g Tr. (doc. no. 107) at 26-27.

[105] Defs.' Mot. for Summ. J. (doc. no. 87-1) at 19.  It is worth noting that the defendants, throughout the pleadings and in oral argument, emphasize Scurry and Hartley's limited personal interactions with the plaintiffs.  *See, e.g.*, Defs.' Mem. Mot. Summ. J. (doc. no. 86-1) at 23. Personal interactions, however, are not required for defendants to be liable for the plaintiffs' alleged constitutional violations.

the policies and customs implicates him personally because of his supervisory position and his admitted knowledge of the CDC Guidance.

Disputed facts relevant to the subjective prong of plaintiffs' claim again preclude summary judgment. The record evidence indicates that Scurry, as Superintendent of HCDOC during the relevant time period, played a central role in developing and overseeing HCDOC's COVID-19 response. While various policies and COVID-19 prevention practices were already in place when Scurry became superintendent in September 2020, Scurry represents that "HCDOC's policies, practices, and directives were [thereafter] supplemented and modified to the reflect the everchanging nature of the COVID-19 pandemic"[106] and testified to his personal participation in making those changes.[107] Scurry further testified that some of the changes made to HCDOC's policies were informed by his review of the CDC Guidance, though he could not recall those changes with any specificity.[108] He also admitted that he was aware that inmates were, for a period of time, forbidden from wearing masks on the housing unit for security reasons, and that HCDOC ultimately lifted that ban.[109] Moreover, the defendants do not, and Superintendent Scurry in particular does not, argue that some other individuals or institution, such as County Commissioners or the County Commission, formulated or implemented COVID-19 response and prevention policies at the jail. While not conclusive evidence on this point, it would appear reasonable then for a trier of fact to

---

[106] Scurry Decl. ¶ 2.
[107] *See, e.g.*, Scurry Dep. 67:5-24.
[108] *Id.*
[109] Scurry Dep. 76:4-24.

conclude that Scurry and Hartley, or one of them, bore ultimate responsibility for one or more of the policies in question.

The plaintiffs argue that a rational trier of fact could find that Scurry was deliberately indifferent to a substantial risk of harm to the plaintiffs based on his having implemented an allegedly deficient masking policy even though he had reviewed the CDC Guidance and understood the dangers of a COVID-19 outbreak.  In response, Scurry points out that the CDC Guidance provides that is not necessary for inmates to wear masks in the facility all the time if the facility is consistently quarantining new arrivals.[110]  The CDC Guidance also states, however, that symptomatic inmates must wear masks, and the plaintiffs allege that, on at least one occasion, symptomatic inmates were forbidden from wearing masks.[111]  Because the court finds a factual dispute about the extent of Scurry's involvement with the mask policy and his awareness of sick inmates on the housing unit, the court denies Scurry summary judgment on the plaintiffs' § 1983 claim.  *See Cintron v. Bibeault*, 148 F.4th 37, 50 (1st Cir. 2025) (affirming denial of motion to dismiss where correctional officials who "held supervisory positions" "plausibly must have known, at least in general terms, the nature of [the facility's] solitary confinement").

## v.    Reasonable measures to prevent risk

Lastly, as to both Nurse Hartley and Superintendent Scurry, the defendants argue that many other courts have generally found both qualified immunity and no deliberate

---

[110] *See id.* at 8 n.2.

[111] *See* CDC Guidance; Am. Compl. (doc. no. 63).

indifference as to correctional officials who implement measures to prevent COVID-19 based on the idea that those who take react reasonably to the risk in a correctional setting cannot be held liable for deliberate indifference. To the extent that the defendants maintain that they took reasonable measures to prevent COVID-19 and therefore have satisfied—indisputably on this record and as a matter of law, *see* Fed. R. Civ. P. 56—the requirements of the Eighth Amendment, the court disagrees. There are many areas—such as quarantining, cleaning, sanitizing, and housing symptomatic alongside asymptomatic inmates—where the plaintiffs dispute the defendants' contentions about their own safety measures. And, because the plaintiffs are the nonmoving party, the court must take all factual inferences in their favor. Therefore, the defendants have not provided undisputed evidence that they took reasonable measures to prevent the virus. *See, e.g.*, *Maney*, 729 F. Supp. 3d at 1139 ("On the present record, a genuine issue of fact remains as to whether Defendants took reasonable measures to abate the risk of COVID, a genuine issue of fact remains as to whether Defendants implemented their COVID policies").

### e. Qualified immunity

The individual defendants submit that they are entitled to qualified immunity and, accordingly, must be dismissed from this § 1983 case. *See Penate v. Hanchett*, 944 F.3d 358, 366 (1st Cir. 2019) ("Qualified immunity provides defendant public officials 'an *immunity from suit* rather than a mere defense to liability'" (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

vi.    **Legal standard**

A plaintiff who seeks to overcome a qualified immunity challenge must satisfy a

two-part test.  First, the plaintiff must show that "the facts alleged or shown by the

plaintiff make out a violation of a constitutional right."  *Id.*  Second, the plaintiff must

demonstrate that "the right [in question] was clearly established at the time of the

defendant's alleged violation."  *Id.*  For the reasons set forth above, the court finds that a

rational jury could find that Nurse Hartley and Superintendent Scurry violated the

plaintiffs' Fourteenth Amendment rights and, accordingly, that the plaintiffs have cleared

the first hurdle.  The court therefore focuses its analysis on the second part of the inquiry,

i.e., whether the plaintiffs' rights were "clearly established" during the relevant time

period.

The "clearly established" inquiry itself has two elements.  *MacDonald v. Town of

Eastham*, 745 F.3d 8, 12 (1st Cir. 2014).  "The first focuses on the clarity of the law at the

time of the violation."  *Id.*  (citing *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir.

2009)) (cleaned up).  "While [the Supreme] Court's case law does not require a case

directly on point for a right to be clearly established, existing precedent must have placed

the statutory or constitutional question beyond debate."  *White v. Pauly*, 580 U.S. 73, 79

(2017) (cleaned up).  The court looks "mainly to Supreme Court and First Circuit

precedent…[but also] consider[] cases from other courts, and certain non-case-law

sources, like statutes, prison regulations, and government studies and reports."  *Cintron*,

148 F.4th at 51-52 (citations and quotations omitted).  The second aspect "focuses more

concretely on the facts of the particular case and whether a reasonable defendant would

have understood that his conduct violated the plaintiff's constitutional rights." *Penate,* 944 F.3d at 366. And "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Cintron,* 148 F.4th at 52. Ultimately, qualified "immunity protects all but the plainly incompetent or those who knowingly violate the law." *White*, 580 U.S. at 79 (cleaned up).

The court acknowledges some tension between the deliberate indifference analysis, which requires proof of subjective intent, and the qualified immunity analysis, which does not. *See Facey v. Dickhaut*, 91 F. Supp. 3d 12, 35 (D. Mass. 2014) (Wolf, J.) (noting that "[s]ome courts have found that the qualified immunity analysis and the Eighth Amendment deliberate indifference analysis fold into each other, reasoning that a reasonable officer would know that conduct amounting to deliberate indifference violates the Eighth Amendment"). As neither the First Circuit nor the Supreme Court has ruled on this question, we will "[a]ssum[e], without deciding, that the question of whether a prison official's conduct violates 'clearly established law' for purposes of qualified immunity is a question distinct from whether the officer acted with deliberate indifference" under the Fourteenth Amendment. *Id.*[112]

---

[112] *See also Martinez v. City of New York*, No. 16-CV-79 (NRM) (CLP), 2023 WL 4627739, at *12 (E.D.N.Y. July 19, 2023), *appeal withdrawn*, No. 23-1175, 2023 WL 9660120 (2d Cir. Nov. 30, 2023) ("This Court shares the view of the numerous courts cited above that have suggested or found that, as a logical matter, it may not be possible for two such findings—liability against a defendant on a deliberate-indifference claim, which is then vitiated by a defense of qualified immunity—to ever coexist in the same case. To do so would require a Court to find that even after a jury has determined, based on legally sufficient evidence, that an officer had the requisite knowledge and mental state to make him deliberately indifferent to a plaintiff's serious medical need, that same officer still somehow harbored an objectively reasonable belief that he was not violating the detainee's right to receive appropriate medical attention.").

### vii.    Nurse Hartley

The plaintiffs contend that, by failing to test inmates for COVID-19, Nurse

Hartley violated their constitutional right to be reasonably protected from communicable

disease.  To conduct the first part of the "clearly established" inquiry, the court considers

"the clarity of the law" on this asserted right as of the time of the alleged violation, i.e.,

2020 to 2021.  *MacDonald*, 745 F.3d at 12.

The court finds that *Helling* supports the plaintiffs' argument that inmates have

long had the right to be free from the risk of serious disease.  In *Helling*, the plaintiff

inmate sued the state prison that incarcerated him, along with several prison officials,

alleging Eighth Amendment violations based on his "involuntary exposure… to

environmental tobacco smoke" based on the smoking habits of his cellmate.  *Helling*, 509

U.S. at 25.  The Court held that "prison authorities may not…ignore a condition of

confinement that is sure or very likely to cause serious illness and needless suffering the

next week or month or year."  *Id.* at 33.  Therefore, the Court found that the plaintiff

inmate could base his Eighth Amendment claim on conditions of confinement that "pose

an unreasonable risk of serious damage to his future health."  *Id.* at 35.[113]

The fact that COVID-19 was a novel virus without significant legal precedent does

not preclude the same conclusion in this case.  *See Est. of Clark v. Walker*, 865 F.3d 544,

---

[113] The First Circuit has affirmed this notion in the context of medical care.  *See Perry v. Roy*, 782 F.3d 73, 81 (1st Cir. 2015) (holding that "the Constitution protects an inmate from a significant risk of future health harms"); *Evariste v. Massachusetts*, No. 20-1137, 2020 WL 8611029, at *1 (1st Cir. Dec. 22, 2020) (citing *Helling* for the proposition that "in conditions-of-confinement context, Eighth Amendment claim could be based upon possible future harm to health").

553 (7th Cir. 2017) ("For purposes of qualified immunity, that legal duty need not be litigated and then established disease by disease or injury by injury.").  To start, as early as 2020, circuit courts had applied *Helling's* ruling that a prison official could violate a prisoner's right to reasonable safety by ignoring conditions of confinement that pose a significant health risk to detainees to the COVID-19 context.  *See, e.g., Roman v. Wolf,* 977 F.3d 935, 943 (9th Cir. 2020) (finding that plaintiffs were likely to prevail on claim that government "failed to meet its constitutional duty to provide reasonably safe conditions" by housing inmates in conditions that made it "impossible" to "combat the spread of COVID-19").[114]   District courts in this circuit had done the same, *see, e.g., Sallaj v. U.S. Immigration & Customs Enforcement,* No. 22-15481, 2020 WL 1975819, at *3 (D.R.I. Apr. 24, 2020),* and otherwise made clear that prison officials cannot subject inmates to conditions that are likely to cause serious illness in the future, *see, e.g., Gomes v. U.S. Dep't of Homeland Sec.,* 460 F.Supp.3d 132, 146 (D.N.H. 2020) (McCafferty, C.J.) (holding that the "Eighth Amendment protects an inmate from being held in conditions that cause both current and future harm" and citing *Helling* for the proposition that an inmate could "successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery").

---

[114] Several other circuits have since reached a similar conclusion.  *See, e.g., Gordon v. Burt,* No. 23-1775, 2024 WL 1842873, at *2–3 (6th Cir. Apr. 24, 2024),* cert. denied, 145 S. Ct. 1046, 220 L. Ed. 2d 378 (2025) ("[A] reasonable prison official would have understood that she could not exhibit deliberate indifference to the risk to inmate safety presented by the COVID-19 pandemic."); *Hampton,* 83 F.4th at 770 ("So too would it be an Eighth Amendment violation for prison officials to be deliberately indifferent to the exposure of inmates to a serious, communicable disease.  *Helling* sent a clear message to prison officials: The Eighth Amendment requires them to reasonably protect inmates from exposure to serious diseases.") (cleaned up).

The defendants' contentions otherwise do not persuade. They argue that "[c]ourts repeatedly have held that, at or near the time of the alleged violation, there was no clearly established constitutional right to be housed in a Covid-free environment." *Harmon v. Harris*, No. 422CV00716BRWERE, 2023 WL 1767578, at *4 (E.D. Ark. Jan. 10, 2023), *report and recommendation adopted*, No. 422CV00716BRWERE, 2023 WL 1766482 (E.D. Ark. Feb. 3, 2023), *aff'd*, No. 23-1371, 2023 WL 5499595 (8th Cir. May 15, 2023). But the plaintiffs do not contend that any amount of COVID-19 in the jail would have been unconstitutional: they argue that the defendants knew of the risks presented by a COVID-19 outbreak yet failed to take reasonable steps to address those risks, like following the CDC Guidance to mask and test symptomatic inmates. On this point, the case law addressed above was sufficiently clear: failing to take reasonable steps to prevent the spread of a serious illness in a detention facility is a violation of an inmate's constitutional rights.

As to the second part of the "clearly established" test, the court finds that a reasonable official in Nurse Hartley's position would have known that her behavior— conducting very little or no testing in the facility from March through December 2020— amounted to a violation of the plaintiffs' constitutional rights. Hartley testified that her role was to "oversee the daily functions of the medical department[, including] oversee[ing]…medical care, mental health, dental, and to make sure that those services were provided."[115] Testing was the best, if not only, way to reliably diagnose (or rule out)

---

[115] Hartley Dep. 6:11-14.

COVID-19, and the plaintiffs have presented evidence that testing was available at Elliot Hospital.[116]

While the CDC Guidance did not explicitly specify the timing or volume of prescribed COVID-19 testing, the guidelines assumed that facilities plan for and conduct testing for symptomatic individuals.[117]  The plaintiffs claim that they saw symptomatic individuals in their unit in mid-December and that the facility did not regularly conduct testing on such inmates until after the outbreak.  By that point, the pandemic had been ongoing for nine months, and it was well established that COVID-19 was both highly transmissible and required testing to be confirmed.[118]  The defendants do not dispute that Nurse Hartley had a responsibility to make sure inmates received medical care and that the jail prevented inmates from infectious disease as best it could.[119]  On this record, the court cannot conclude that Nurse Hartley enjoys qualified immunity from the plaintiffs' remaining claims as a matter of law.  Her request for summary judgment on that basis is denied.

---

[116] *Id.* at 38:20-22 ("Before the outbreak we tested, I think, based on inmate complaints and symptoms, so we were not regularly testing swab-wise….[W]e had the ability to swab them, to test them, and then send that to Elliot [Hospital], which…we used for our labs.").

[117] *See* CDC Guidance at 6 ("Facilities without onsite healthcare capacity should make a plan for how they will ensure that suspected COVID-19 cases will be isolated, evaluated, tested (if indicated), and provided necessary medical care"); *id.* at 22 ("Medical staff should evaluate symptomatic individuals to determine whether COVID-19 testing is indicated").

[118] *See id.* at 4 (defining a "confirmed case" of COVID-19 as one in which an individual "has received a positive result from a COVID-19 laboratory test, with or without symptoms").

[119] Pls.' Suppl. Memo. (doc. no. 104) at 10-11.

viii.    **Superintendent Scurry**

As to the existence of a clearly established right, the same analysis regarding whether the plaintiffs have established a right to conditions of confinement without a serious risk of contagious illness applies.

As to the violation of a constitutional right, Superintendent Scurry testified to a measure of personal involvement with the contested mask policy, which conflicts with CDC Guidance to the extent that inmates exhibiting symptoms of COVID-19 were prohibited from wearining masks in certain common spaces at the jail.  And, as the chief correctional official for the County, and the chief executive of HCDOC, he ultimately bore responsibility for formulating and implementing its policies, including its COVID-19 prevention policies.  *See Ahlman v. Barnes*, 445 F. Supp. 3d 671, 691 (C.D. Cal. 2020) (holding that the CDC Guidelines were the "floor, not the ceiling" of constitutional compliance and "[a]n institution that is aware of the CDC Guidelines and able to implement them but fails to do so demonstrates that it is unwilling to do what it can to abate the risk of the spread of infection[and, i]n other words, failure to comply demonstrates deliberate indifference toward the health and safety of the inmates"); *Maney v. Oregon*, 729 F. Supp. 3d 1087, 1146 (D. Or. 2024), *aff'd*, No. 24-2715, 2025 WL 1794110 (9th Cir. June 30, 2025) (denying qualified immunity for prison officials because "individuals in custody have a clearly established constitutional right to

protection from heightened exposure to a deadly disease").[120]  On this record, Scurry is
not entitled to qualified immunity as a matter of law and is denied summary judgment on
that basis.

### f.  Lack of expert testimony

The defendants argue that they are entitled to summary judgment because the
plaintiffs have not offered any expert testimony on the inadequacy of HCDOC's COVID-
19 procedures during the relevant time period and therefore cannot establish that the
defendants proximately caused the plaintiffs' alleged injuries.[121]  The defendants
emphasize that the plaintiffs' claims are "not premised on a complete lack of response by
HCDCOC and its staff" but rather the "sufficiency and quality of HCDOC's response,"
which they say cannot be evaluated without expert testimony opining on whether the
measures in place fell below the requisite standard of care.[122]  To support this contention,
the defendants rely on cases applying the general rule that an inmate who brings a claim
based on the medical treatment he or she received while detained "must show that the
medical care. . . [was] not adequate, as measured against prudent professional standards."
*Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 142 (1st Cir. 2014) (internal quotations
omitted); *see, e.g., Roberts v. Wentworth-Douglass Hosp.*, No. 09-CV-34-SM, 2011 WL
1230334, at *4 (D.N.H. Mar. 29, 2011) (requiring expert opinion evidence to ascertain

---

[120] Here again, the court notes that Superintendent Scurry does not contend that there was
another individual or institution, such as County Commissioners or the County Commission,
responsible for formulating or implementing the COVID-19 response and prevention policies at
the jail.
[121] Defs.' Mot. for Summ. J. (doc. no. 86-1) at 32-33.
[122] *Id.* at 32.

"whether the medical judgment exercised by the defendant physicians fell below an acceptable standard of professional care … [and] that the medical care provided to [the inmate] was so substandard as to implicate the Eighth Amendment" because the medical treatment provided to inmate was not "obviously outrageous" (*quoting Boudreau v. Englander*, No. 09-CV-247-SM, 2010 WL 2108219, at *3 (D.N.H. May 24, 2010))); *Smith v. Wrenn*, No. 07-cv-408-SM, 2009 DNH 091, 2009 WL 1783539, at *6 (D.N.H. June 23, 2009) (finding absence of "expert medical testimony" fatal to plaintiff's Eighth Amendment claim where the record was devoid of evidence "suggesting that defendants' treatment of [plaintiff] was so far below acceptable medical standards as to constitute an unnecessary and wanton infliction of pain").

The court is unpersuaded. To start, evidence showing that medical treatment fell below acceptable professional standards goes towards the objective component of an Eighth Amendment claim. *See Nunes*, 766 F.3d at 142 (proving an Eighth Amendment claim "based on a prisoner's medical treatment" requires the inmate to show that he faced an "objectively intolerable risk of harm" by establishing that he received inadequate medical care "as measured against prudent professional standards" (internal quotations omitted)). But the defendants have contested only the subjective component of plaintiffs' claim, i.e., whether the plaintiffs have shown that they "kn[ew] of and disregard[ed] the risk of harm." *Farmer*, 511 U.S. at 837; s*ee also Est. of Beauford v. Mesa Cnty.*, 35 F.4th 1248, 1262 (10th Cir. 2022) ("[T]he focus of the subjective component is the mental state of the defendant with respect to the risk of that harm."). In other words, the defendants do not challenge that the policies that form the basis for the plaintiffs' remaining

claims—prohibiting inmates from wearing masks in certain common areas and failing to conduct any testing on symptomatic inmates living among the general population—presented "an objectively intolerable risk of harm" to the plaintiffs, *Nunes*, 766 F.3d at 142, only that they did not know of and turn a blind eye to that risk.[123]

As such, the source of contention in this litigation is not the appropriate standards of care but rather the defendants' implementation of CDC Guidance that both parties have treated as authoritative. While the defendants correctly point out that the guidelines offered by public health officials are not mandates and that their compliance (or lack thereof) with those guidelines is not dispositive of the plaintiffs' claims,[124] they do not dispute that those protocols should have guided their COVID-19 response. *See Ahlman v. Barnes*, 445 F. Supp. 3d 671, 690–91 (C.D. Cal. 2020) ("The suggestions laid out in the CDC Guidelines represent expert medical advice regarding measures needed to limit the spread of COVID-19."). To the contrary, the defendants emphasize that they "relied upon CDC guidance applicable to correctional facilities" and that their "policies, practices, and procedures evolved and changed as guidance from various authorities like the CDC and DHHS evolved." [125]

---

[123] *See, e.g.*, Defs.' Mot. for Summ. J. at 24-25 (arguing that "neither Diminico nor Jordan were aware of any individuals on the housing unit who were positive for COVID-19 at the time they instructed Porter to remove his mask").

[124] Defs.' Reply Mot. for Summ. J. (doc. no. 94) at 2 n.3; *see generally* Defs.' Response to Pls.' Supp. Stip. (doc. no. 112).

[125] Martineau Decl. ¶¶ 6, 18.

Documentation in the summary judgment record regarding the defendants'
COVID-19 response reflects this by making frequent reference to the CDC guidance.[126]
For example, an April 2020 memorandum directing staff to wear a surgical mask "at all
times" begins with the following explanation:

> As you are all aware, the CDC studies show that whether individuals are
> symptomatic or asymptomatic, COVID-19 and the coronavirus can still be
> transmitted to others because the virus can be spread between individuals
> interacting within close proximity of one another.  The CDC is now
> recommending that "face coverings" or masks be worn in health care
> settings, public places and work environments.  This is especially true
> where social distancing can present a challenge as well as in an effort to
> decrease the risk of community-based transmission.[127]

Other memoranda refer to specific recommendations that HCDOC received from
agencies like DHHS and the NH Bureau of Infectious Disease Control following the
December 2020 outbreak—e.g., a list of COVID-19 preventative measures on which staff
should be reeducated—and thus provide contemporaneous insight into the adequacy of
the defendants' COVID-19 response as assessed by public health officials.[128]

In short, the summary judgment record contains evidence showing that the
defendants received expert medical advice regarding measures needed to limit the spread
of COVID-19, including facility-specific advice from experts with direct knowledge of
HCDOC's COVID-19 response strategies and practices.  The plaintiffs' remaining claims
concern aspects of that advice that the defendants allegedly could have but did not
implement.  *See Ahlman*, 445 F.Supp. 3d at 690-91 ("An institution that is aware of the

---

[126] *See, e.g.*, Defs.' Mot. for Summ. J. (doc. no. 86-3) at 42, 50-53.
[127] *Id.* at 50.
[128] *See, e.g., id.* at 179, 181-183.

CDC Guidelines and able to implement them but fails to do so demonstrates that it is

unwilling to do what it can to abate the risk of the spread of infection.").  On this record,

the court cannot say that, as a matter of law, the plaintiffs will be unable to prove

deliberate indifference without expert testimony.[129]

### g.  *Monell* claim

The plaintiffs' final count rests on the same set of challenged policies that form the

basis for its claims against the individual officers.[130]  Because of Porter and Chaney's

limited grievances, *see supra*, the court considers their *Monell* claim as it relates to two of

those policies: (1) that inmates were not allowed to wear masks on the housing unit, thus

increasing the plaintiffs' risks of contracting COVID-19; and (2) that the lack of COVID-

19 testing in the facility increased that same risk.

A municipality may face liability only under the limited circumstances set forth

under *Monell*, 436 U.S. 658; namely, when the "'execution of [the municipality's] policy

or custom ... inflicts the [plaintiff's] injury' and is the 'moving force' behind the

---

[129] At oral argument on this motion, the court understood the defendants to suggest that the plaintiffs cannot, as a matter of law, prove that the defendants' behavior "subject[ed] or caus[ed] to be subjected" a deprivation of their constitutional rights without expert testimony.  This argument refers to the standard of causation for liability, as opposed to—as originally understood (or perhaps misunderstood) by the court—causation of the plaintiffs' damages in the form of physical injury, pain and suffering, or emotional distress, which commonly involve expert testimony.  But the First Circuit Court of Appeals "employ[s] common law tort principles when conducting inquiries into causation under § 1983," *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 50 (1st Cir. 2009) (citation omitted), and thus whether the policies here "caused" the deprivation of constitutional rights presents a simpler question which a reasonable jury could potentially answer in the affirmative.  *See id.* at 50 ("[T]he causal connection alluded to by the statute "can be established not only by some kind of [ ] personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.") (citation omitted).  This argument fails.
[130] *Id.*

[plaintiff's] constitutional violation," *Saldivar v. Racine*, 818 F.3d 14, 20 (1st Cir. 2016)

(quoting *Monell*, 436 U.S. at 694).

> [T]o establish a § 1983 claim against a city or county, a plaintiff must
> prove that:  (1) a municipal policy maker intentionally adopted a policy,
> implemented a training protocol, or allowed a custom to develop; (2) the
> challenged policy, training protocol or custom caused a violation of the
> plaintiff's constitutional rights; and (3) the policymaker acted with at least
> deliberate indifference to the strong likelihood that unconstitutional conduct
> will result from the implementation of the policy, training protocol or
> custom.  The deliberate indifference component of this test can be satisfied
> through allegations that a policy maker either knew or should have known
> of the serious risk that the challenged policy, custom, or training protocol
> would result in unconstitutional conduct.

*Smart v. Strafford Cnty.*, No. 2024 DNH 095, 2024 WL 4751400, at *8 (D.N.H.

Nov. 12, 2024) (Barbadoro, J.) (cleaned up).  The defendants did not dispute the

identity of the final policymaker, so the court does not discuss it here.[131]

### i.    Mask policy

The *Monell* claim arising out of HCDOC's prohibition on inmates wearing masks

in common areas of housing units in the presence of symptomatic inmates survives for

many of the same reasons discussed above.  The defendants do not dispute that they

intentionally adopted the policy and factual disputes remain regarding whether the

plaintiffs suffered a constitutional violation.  The plaintiffs have raised a triable issue of

fact over whether Hillsborough County acted with deliberate indifference in

implementing such a policy because it ran contrary to the CDC Guidelines that were

---

[131] *See supra* n.120.

known to the defendants and that the defendants had the ability to implement. The court accordingly denies summary judgment to Hillsborough County.

### ii. Testing

The same is true for the *Monell* claim based on HCDOC's alleged failure to test inmates for COVID-19 until December 2020, nine months into the pandemic and well after the facility allegedly had the ability to test and guidance recommending it. Such a claim relies on HCDOC's failure to act in sustained practice, rather than its official policy (which was to test complaining symptomatic inmates for COVID-19). As discussed *supra* III(d)(iii), however, the plaintiffs have established a genuine issue of material fact regarding (at least) whether Nurse Hartley and/or Superintendent Scurry—arguably, the decisionmakers or policymakers here—demonstrated deliberate indifference in allowing this practice to develop and persist. Therefore, the court also denies summary judgment as to this claim.

## IV. <u>Conclusion</u>

For the reasons stated above, the court grants in part and denies in part the defendants' motion for summary judgment. The court grants the defendants' motion for judgment on the pleadings[132] and the motions for summary judgment[133] as to Deputy Chief Brian Martineau and Officers Diminico and Jordan. Summary judgment is denied as to Superintendent Scurry regarding his implementation of the mask policy, Nurse

---

[132] Doc. no. 84.
[133] Doc. nos. 86 and 87.

Hartley regarding the lack of testing in the facility, and Hillsborough County Department of Corrections regarding both policies.

SO ORDERED.

_____
Joseph N. Laplante
United States District Judge

Date: November 6, 2025

cc: Counsel of Record